## DEN, ON THE DEMISE OF CHEWS, v. SPARKS.

1. A, in 1776, made a voluntary deed to his children of his estate, in order that, if the king of Great Britain succeeded in the subjugation of the country, no forfeiture of the estate might occur. He afterwards took refuge with the British troops in 1779, was taken, and convicted of high treason against the State of New Jersey, and the estate in question confiscated and sold. The children of A claim the premises under the deed of 1776. This deed is not fraudulent as against the state, and their claim is good and cannot be affected by the treason of their father, committed a long time afterwards.

2. What delivery of a deed sufficient.

This was an ejectment for lands situate in the county of Gloucester. The cause had been tried at bar and a verdict given for the plaintiffs.

*Leake* and *Ab. Ogden* had obtained a rule to show cause why a new trial should not be granted on the ground : 1st. That the verdict was against the direction of the court; 2d. That it was contrary to evidence.

It appeared that the lessors of the plaintiff were the children of one Jonathan Chew, who, in 1779, took refuge with the British troops, was afterwards taken, convicted of high treason against the state of New Jersey, and all his property confiscated. They claimed under a voluntary deed from their father, dated on the 29th of July, 1776, by which he conveyed to them the premises in question. The defendant claimed as purchaser of one of the plantations, seized and sold by the commissioners of forfeited estates, under the conviction and attainder of Jonathan Chew, in 1779.

On the trial of the cause, it was contended, on the part of the defendant, that the deed, under which the lessors of the plaintiff claimed, was made with a view to an act of treason, and to prevent a forfeiture, and was therefore void, as against the State of New Jersey, and those claiming under the state.

On the other hand, it was argued that although the deed was unquestionably a voluntary conveyance, in consideration of natural affection, and made with a view to prevent a forfeiture for treason, yet the forfeiture contemplated, and the treason intended, was against the king of Great Britain, with whom we were at that time engaged in hostilities, and from whom the grantor, being then in arms against him, might reasonably anticipate the punishment incurred by an act of rebellion, [57] should the enemy succeed in subjugating us. That, as concerned the state of New Jersey, this conveyance, so far from being void, was highly meritorious, and valid ; and that, if good at the time, it vested an estate in the grantees which could not be divested by a treason committed by the grantor three years afterwards.

Mr. Justice Smith, before whom the cause was tried at bar, charged the jury against the deed of 1776. He said, whatever might have been the intent of the grantor originally for making this deed, the question is whether he afterwards con-

Den, ex dem. Chews, v. Sparks.

verted it to another purpose, which it is acknowledged, and cannot be denied, would have avoided the deed, had it been originally contemplated. The intention was to avoid a forfeiture, and had Great Britain succeeded in her attempts to subjugate this state, the conveyance would have been adjudged fraudulent. Shall it, then, prevail against the state? It is like a piece of artillery directed originally against the enemy, but which, while remaining undischarged, is turned upon its pivot and fired upon the republic. I approve of the intentions of Chew originally, but I cannot think that good intentions will sanctify a fraudulent act.

1st. On this motion it was now urged by the counsel for defendant, that the direction of the judge was right, and according to law, and the jury having found a verdict contrary to this opinion, had done wrong, and a new trial should be granted.

2d. It was further argued that there was no evidence that this deed was ever delivered to the grantees, which is a circumstance essential to give validity to a conveyance. 3 *Bl. Com.* 306, 307 ; *Shep. Touch.* 57, 58, &c. ; *Gilb. Evid.* 78–9 ; 4 *Com. Dig.* 158, title " *Fait,*" A 3.

3d. The deed also was a voluntary gift from the father to his children, and is therefore void against a *bona fide* purchaser. As between the parties, such a grant is good, but it cannot stand in the way of another person, neither party nor privy to it, or having notice of it.

4th. This deed is fraudulent on another ground : it was concealed from all the world. The grantor continued himself [58] in possession of the premises ; no claim was interposed on the part of the now claimants to prevent the seizure and sale, and innocent persons were permitted, without any kind of warning, to purchase the property as belonging to Jonathan Chew, to advance their money to the state, to incur expenses for improvements, and are now called upon to deliver up the estate to these unwatchful owners upon a dominant title, under a mere gift to them by their father, previous to his treason. 2 *Vern.* 150, 510.

It is clear that on all these grounds of objection collectively, the deed should be adjudged void, and the jury have drawn an illegal inference, contrary to the express direction of the court, the verdict ought to be set aside. In the case of *The Queen* v. *Ballivos, &c.*, 1 *P. Wms.* 212, the court ordered a new trial, because the jury found a verdict contrary to the direction of the court, on a trial at bar. So in the case of *Bright, Executor,* v. *Eynon*, 1 *Burr.* 390, where the court thought the jury had drawn a wrong inference from the facts. In *Tindal* v. *Brown*, 1 *T. R.* 167, a new trial was awarded twice, because the verdict was contrary to law.

The question which the jury undertook to decide, and which they did decide, was altogether a question of law, which it was the prerogative of the court to determine. *Foster Cr. Law* 255–6. The facts were all admitted, and the question was, whether from these facts the conveyance was fraudulent.

The deed in question was a surprise upon the defendant; besides, at the trial, he had never heard of it before. His counsel had but little opportunity of examining it, but from that opportunity were decidedly of opinion it was a forgery. In the case of *Stace* v. *Mabbot*, 2 *Vesey* 553, the Lord Chancellor said that new trials were frequently granted in cases of forgery. In the case of *Fabrilius* v. *Cock*, 3 *Burr.* 1771, a new trial was moved for, on the ground that the whole case was a fiction, supported by perjury, which the party could not have come to the trial prepared to answer, and the court granted the motion.

[59] The charge delivered by the judge before whom the trial was had, is clearly law. By the statute of 13 *Eliz.*, c. 5, alienations to defraud creditors, or to prevent forfeitures, are declared void. 3 *Rep.* 82. It is of no consequence who is the person intended to be defrauded. If one attempting to strike A, give a blow to B, it is equally an assault, and equally criminal, as if he had struck where he intended.

There are certain principles which have been adopted and sanctioned by courts, which constitute a part of the law, and

Den, ex dem. Chews, v. Sparks.

by which all judicial tribunals should now think themselves bound. The statute 27 *Eliz*, *c.* 4, extends to and protects sales made either before or after the fraudulent grant. According to *Burrel's case*, 6 *Rep.* 72, all fraudulent conveyances are void. A subsequent mortgage was preferred to a voluntary settlement on a wife, though the mortgagee had notice. *Chapman* v. *Emery*, *Cowp.* 273. It was also held by Lord Chancellor Hardwicke, in *Lord Townshend* v. *Windham*, 2 *Vesey* 10, that a voluntary conveyance, though no fraud, is void against a subsequent purchaser for a valuable consideration. If a man, says Roller, (2 *Roll. Abr.* 34) makes a feoffment to the use of his son, an infant, and ten days afterwards commits treason, of which he is attained, this land shall be forfeited; for the feoffment was fraudulent against the king. So, in the same book and page, if a man alien his estate fraudulently, with an intent to prevent a forfeiture, and afterwards commits felony, the land shall be forfeited. If A, being in prison for a robbery, makes a bill of sale of all his goods, to the intent to make a provision for his son, the bill of sale is fraudulent. *Jones* v. *Ashart*, *Skin.* 357. Lord Mansfield, in delivering judgment in the case of *Cadogan* v. *Kennet*, *Cowp.* 434, says, "the principles and rules of the common law as now universally known and understood, are so strong against fraud in every shape, that the common law would have attained every end proposed by the statutes. 13 *Eliz.*, *c.* 5, and 27 *Eliz.*, *c.* 4. These statutes cannot receive too liberal a construction, or be too much extended in suppression of fraud."

[60] Under our own act of assembly (act of December 11th, 1778, *Wilson L. N. J.* 67), all sales to avoid a forfeiture are declared fraudulent and void.

Here, also, it is to be observed, that the conveyance was of *all* the property of the grantor; four plantations are included in the deed, of which this is only one, and the language of Lord Mansfield, in *Worseley* v. *De Mattos*, 1 *Burr.* 478, where he said " there is a great difference between the conveyance of *all* and of a *part*. A conveyance of *part* may be

public, fair and honest; but the conveyance of *all*, wears the strongest appearance of fraud." *Green's Bank. Law* 49; 2 *Burr.* 831.

*Frelinghuysen* against the motion.—The facts that this deed was a forgery, and that it was concealed from the world, so far from being supported by the testimony, are in the fullest manner contradicted by the evidence of the most respectable men. It is proved to have been known, to have been minutely examined, and not a color exists at this time for the insinuations that have been made; more particularly as the defendant's counsel urged at the trial that the deed was a forgery, and it went with their remarks to the jury, who have decided this question of fact.

Another objection has been urged, that this deed was not actually delivered to the grantees. This is an objection which third persons cannot make. The deed was executed, and it is immaterial to all the world, excepting the grantor himself, whether there was an actual delivery or not. But there was evidence before the jury as to the very fact of delivery; at least circumstances shown from which they might infer a delivery. In the case of *Cooper* v. *Gooderich, Cro. El.* 862, a delivery to a stranger without letter of attorney was held good; and in the case of *Cross* v. *Powell, Ibid.* 483, it was said, that a delivery to the party is not material; and in *Shelton's case, Ibid.* 7, it was held that a grant was good without actual delivery; if it be actually executed, and not countermanded, it is sufficient.

The law with regard to fraudulent conveyances is not precisely as laid down by the opposite counsel. There is, per-[61]-haps, no case in which a deed made previous to the incurring of a debt, has been held fraudulent as against creditors. Lord Hardwicke, in 1 *Vesey* 11, expressly says: "If there is a voluntary conveyance of real estate or chattel interest, by one not indebted at the time, though he afterwards becomes indebted, and no particular evidence or badge of fraud, to deceive or defraud subsequent creditors, that will

be good." And in the case of *Haywood* v. *Hammond*, 1 *Atk.* 15, the same learned judge says: "There are many opinions that every voluntary settlement is not fraudulent. What the judges mean is, that a settlement being voluntary, is not, for that reason, fraudulent, but an evidence of fraud only. *Bovey's case*, 1 *Vent.* 193 ; 1 *Mod.* 119, *Lord Tenham* v. *Mullins.* Though I have hardly known one case where the person conveying was indebted at the time of the conveyance, that has not been deemed fraudulent, there are, to be sure, cases of voluntary settlements that are not fraudulent; and those are, where the person making them is not indebted at the time; in which case, subsequent debts will not shake such settlement." (*a*)

The statute of 13 *Eliz.*, c. 5, is now considered as merely declaratory of the common law, and, under that statute, and the cases that have been decided upon it, the debt must precede the fraudulent conveyance. Agreeably to this is the doctrine laid down in *Bull. N. P.* 257—the debt must precede, or the intention to incur the debt must precede the grant, or it is no ground for invalidating it. "If the gift were precedent to the right or debt, there is no way, in such case, to set aside the conveyance." 3 *Bac. Abr.* 307. This doctrine seems also to pervade *Twin's case*, in 3 *Reports*, which has been referred to.

With regard to the statute 27 *Eliz.*, c. 4, we shall consider the case as if strictly within its spirit and words, and then show that it does not reach us.

[62] The intention of this act was to secure purchasers, but this is not to be done by presuming fraud. *Covin* is never to be intended or presumed in law; it must be expressly assured and proved. 10 *Rep.* 56. The nature of this instrument is, however, mistaken. It is not a voluntary

(*a*) In the case of *Hungerford* v. *Earle*, Lord Commissioner Hutchins held such settlement void as against subsequent creditors. 2 *Vern.* 261. But, as is observed by *Fonblanque*, 1 *Tr. on Eq.* 263, *nota*, this opinion was evidently influenced by the provisions of the settlement not having been pursued.

conveyance; it is a grant to a man's own children, in consideration of love and natural affection, which is a good consideration. A conveyance of this kind carries with it no presumption of fraud; it is frequent, fair, and honest. In most cases, it is a highly meritorious act, and, from the peculiar circumstances of this case, it should rather be upheld than frowned upon by the court.

But even voluntary conveyances are not, *ipso facto*, fraudulent and invalid. Other circumstances must be shown to overturn a solemn act of this kind.

With regard to another objection, that the parties should have come forward at an earlier period, and claimed the property or given notice of the deed, it is a matter of notoriety that they were infants at the time of the sale by the commissioners, and, therefore, no laches is to be attributed to them. It appears, from the evidence which the other party has produced, that this deed was known long since; it was known to the foreman of the jury, a respectable man, and in public life; there was no secrecy in the business.

It is, however, contended that this deed, having been made with a view to the commission of treason, is, therefore, fraudulent and void.

It was proved, that at the time of making this deed, the grantor was an active man in opposition to the claims of Great Britain. He entertained apprehensions, as every one else did, of the possibility of our failing in the attempt to obtain the objects contended for, and he was prompted by a laudable regard to the welfare of his infant family, to endeavor to secure them against the consequences of a forfeiture. At this time, none of those legislative acts which have been alluded to, had been adopted in this state. There was no statute from which, even if he contemplated joining the enemy, he could have feared a forfeiture. All his apprehensions were directed another way.

[63] In the case that has been cited from *Roll.*, the conveyance was made in contemplation of an act of treason which was perpetrated within ten days afterwards. The case

from 1 *Ventris* 128, if properly considered, removes all ambiguity and doubt from the subject, and shows that no forfeiture can be created by a subsequent statute, so as to invalidate a previously subsisting deed. If, therefore, Jonathan Chew made this deed with a view to go over to the British army, as there was no law which prohibited his going, the statute which has since passed cannot divest rights which accrued to the lessors of the plaintiff so long before.

But a supposition that he had such an idea in contemplation is contradicted by the whole train of the evidence. He designed to preserve his property to his children from British confiscation ; and the doctrine that a deed framed with this intent is fraudulent against the State of New Jersey, is consistent neither with law nor reason. If the king of England had succeeded, his courts would have adjudged that the deed was made against a lawful sovereign, against whom the grantor was in rebellion ; but the success of the contest has conferred a sanction upon all our efforts of resistance, and has equally sanctioned every attempt made to secure our property, as well as our liberty, against his illegal pretensions.

It is clear from 10 *Co.* 57, *b*, that a deed may be fraudulent as to some intents, and good as to others.

The jury have settled this question of fraud after a long and full investigation, and, as it is a case of ejectment, the court ought not to grant a new trial.

*R. Stockton*, on the same side. The deed from Jonathan Chew was valid, and impugned no principle of the common law, nor any statutory provision.

It was executed in July, 1776, during the period which occurred between the throwing off an old government, and the establishment of the new one ; it was executed by a man who, both before and after, was in arms against Great Britain, and a friend to this state, who acted as a committee man, was a candidate for offices, and whom there is not the remotest ground for believing that he had at the time any idea of acting otherwise.

[64] It appears to have been made by the advice of a prudent friend, to prevent a British forfeiture—to prevent the property from being confiscated by the enemy ; and before this deed can be adjudged fraudulent, it must be established as a principle, that an attempt to defeat the machinations of an enemy, endeavoring to subvert our rights and liberties, is fraudulent.

Had the contest terminated in our defeat and subjugation, the enemy would have considered it as made to defraud a lawful king, and to prevent the consequences of an act of open rebellion ; but with us, every principle which renders our resistance a legal or a meritorious act, speaks loudly in support of every measure, not in itself criminal, which tended to the advancement of this object. All fraud tends to deprive some one of a right which he has either in possession or in expectancy. The moral turpitude on the one side, and the legal right on the other, are equally necessary. While, then, we confer upon our resistance the epithets of legal and meritorious, we sanctify the means made use of to defeat the purposes of those whose violence we opposed. To protect our property against an enemy is not wrong—has no moral turpitude in it—and the king of England had no legal right or just title to any forfeiture. Both the circumstances, therefore, essential to the fraud, are wanting, and the act cannot be viewed either as illegal or dishonest.

The law of nature justifies every resistance to an enemy. The design here was not to defraud any individual of property to which he had acquired a just title, but to protect it against an unjust invasion under color of a right not allowed by us, and against a government from all ties to which we were absolved by the declaration of independence.

10 Co. 57 proves that fraud, with intention to deceive one, may be good against another, which is stronger than the present case, because the act of fraud there involved an act of moral turpitude.

As to this deed being designed to deprive the state of a legal right to a forfeiture, it is utterly impossible that this

should have been the case. The treason act was not passed by the legislature until October, 1776, and the deed was executed in the month of July preceding. Before the passing [65] of this treason act no conviction could have forfeited the estate; indeed there could be no treason until the establishment of the government. The opinion of Chief Justice McKean, in the case of Chapman, 1 *Dall.* 53, is clear to this point. It seems to be a point admitted upon all sides in that case, and approved of by the court, that until the actual establishment and organization of a government, capable of affording protection to the citizen, there was no allegiance due, and consequently no treason.

This seems also to be the opinion of our own legislature, who in the act of December 11th, 1778, ( *Wils.* 67, § 2,) declare that all who joined the British army between April 19th, 1775, (a) and the 4th of October, 1776, (b) shall be adjudged guilty of treason. Whatever objections may be made to this law, on the ground that it declares an act treasonable against a government that had at the time no legal existence, or declares an act criminal long after it had occurred, this much at least may be inferred from it, that in the opinion of the legislature, the act of joining the enemy between these two specified periods, would not have been criminal or punishable without this express law. If there could, then, have been no treason at the time of executing this deed, because there was no government against which this crime could be committed, there could for the same reason be no design to defraud a government which had no existence. It would have required, as Twisden says, in 1 *Ventris* 128, a spirit of prophecy.

I rely with confidence on this case in *Ventris* as containing every principle for which we have any desire to contend. Justice Twisden says in that case, that it could not be a fraud for the very reason I have given, because made before

(a) The time of the commencement of hostilities.

(b) The date of the treason act.

the act, though pending a civil war. The terms of the settlement were a lease for years, reserving an estate for life, for the benefit of an unborn child, the deed never delivered, and what is still stronger, containing a power of revocation. The lessor retained the possession, and received the profits during his life, yet was it held good.

[66] Another objection which has been urged is, that this deed never was delivered. There ought to be a delivery, otherwise it cannot be a deed. 13 *Vin. Ab.* 21, " *Fuits,*" I, *pl.* 1. This is undoubted law, but the true meaning is that the grantor must execute it as a good and ·valid deed, and that it must come to the hands of the grantee. There is no precise form which it is necessary strictly to pursue, and the party will be estopped to say it was not delivered. 13 *Vin. Ab.* 22, " *Faits,*" I, *pl.* 10. Sealing and acknowledging before a mayor, if the statute is good, amounts to a delivery. *Shep. Touch.* 58. Under an act of assembly, (*Allinson* 33, § 3,) the acknowledgment of a deed makes it good to all intents and purposes, and full evidence of its execution. The facts proved at the trial, if they did not prove a delivery in terms, justified the jury in inferring that there was one. In *Shelton's case, Cro. El.* 7, the delivery was altogether a matter of inference.

The allegation that the deed was concealed, is contradicted in express terms by the evidence. Some caution was necessary, owing to the turbulence and irritation of the times; the children were infants, and further than these circumstances necessarily operated, there has been no concealment.

With respect to the continuing in possession, I deny both the law and the fact. The rule that a continuance in possession is a badge of fraud, or a circumstance from which fraud may be inferred, is not applicable to real estate; it refers exclusively to personal property, where it is impossible to trace the chain of title, or to ascertain anything further than the possession. Real estate is not so transitory in its character, and can scarcely be called an article of commerce. In purchasing it we always call for the deed, we always investigate

the title; but commercial principles require other rules with regard to real property. Twine's case, which is the leading one upon this subject, proves this distinction to be well founded. The case of *Edwards* v. *Harben*, 2 *T. R.* 587, confines the rule altogether to chattels. Lord Mansfield, in *Cadogan* v. *Kennet*, restricts the operation of the rule in the same manner.

[67] But the fact that the possession is not transferred is at best a circumstance from which fraud may be presumed, and admits, therefore, of explanation, as in the case of *Cadogan* v. *Kennet*. Here we should refer to the relation subsisting between the parties. The grantees were infants—they were the children of the grantor—and these facts are amply sufficient to rebut every idea of a fraudulent retention of the possession. 16 *Viner* 455, " *Possession,*" *A, pl.* 11. Tenant at will, and he in reversion, living in the house as housekeeper, the first is in possession.

Here, also, an estate for life was reserved to the wife, so that the children had no right to it.

It has likewise constituted a ground of objection to this deed that by it the grantor conveyed all his real property, stripped himself of every resource, and therefore wears every appearance of fraud. Fraud is not to be presumed in any case, nor will any circumstances which can be satisfactorily explained in another manner authorize such an inference. Here the object which the grantor had in view removes every thing like suspicion as to the fraud. We are informed of his real motives, and we cannot fairly presume that he was actuated by any other. Besides, the cases cited are commercial cases; they were decided upon the bankrupt law, and have not in their principles the remotest analogy to that before the court. There is no creditor here to complain that the property which his debtor professed to have, the fund to which he looked for payment, has been fraudulently snatched from him, and bestowed upon persons no otherwise entitled than himself to reap the benefit of it. It is good as against the commissioners of forfeited estates, and we are not to inquire

whether, had Jonathan Chew been a merchant, involved in debt to numerous creditors, a disposition of the whole of his property would or would not have been deemed fraudulent.

It is admitted that, as against Chew himself, this conveyance was good and valid. If so, no man can forfeit a larger estate than he himself possesses. *Cranmer's case, Moore* 100, *pl.* 244; *The King* v. *Cotton,* 2 *Vesey* 288, 297; *Nichols* v. *Nichols, Plowd.* 481, 487. If the deed was [68] good against Chew, he could not, two or three years afterwards, forfeit by any act of treason that estate which had already been vested in others. The commissioners of forfeited estates could not have acquired a right to dispose of any other estate, nor can the defendants, claiming under them, be entitled to what they could not have disposed of.

The statute, 13 *Eliz.,* c. 5, relates only to creditors, not to purchasers or forfeitures in criminal cases. If a grant was intended to defraud a purchaser, no matter at what time it was made, it is void. But in this case they should prove that the public had an actually subsisting right to the property in question, otherwise the cases do not apply. The statute can only operate upon some actually subsisting right.

Neither is the case within the 27 *Eliz.,* c. 4. Here was no subsequent sale. Chew never made any further disposition of this property; and no sale is covinous, unless fraudulent at first, or a fraudulent use is made of it.

The case of *Doe, ex dem. Watson,* v. *Routledge, Cowp.* 705, shows that it is not every voluntary conveyance that is void. Lord Mansfield in that case said: "The statute does not say a voluntary settlement shall be void, but that a fraudulent settlement shall be void. There is no part of the act of parliament which affects voluntary settlements, *eo nomine,* unless they are fraudulent." "The doing a rational act, without any intention or view of defeating anybody, would not render the settlement fraudulent, though it was absolutely voluntary." "No person making a voluntary settlement by way of provision for his family, was ever considered in that criminal light." "If the circumstances of the transaction

show that it was not fraudulent at the time, it is not within the meaning of the statutes." So, also, 13 *Vin. Ab.* 515, "*Fraud,*" *A*, 2, referring to the case of *Stone* v. *Grabham*, 2 *Buls.* 226, "Fraud ought to be fraud at the beginning, for subsequent fraud will not make a conveyance fraudulent."

This case stands now before the court after a long trial— after the defendant has had an opportunity of urging all these matters to a jury, and after the jury has pronounced that [69] the deed is good. The question was fully submitted to them by the judge who presided at the trial; they were told that if the deed was fraudulent a verdict should be found for the defendant; if not, for the plaintiff.

The direction of the judge to the jury should be hypothetical, (*Bushnel's case, Vaugh.* 144,) and the jury have a right to judge of the whole case.

The intent here was the principal thing to be ascertained by the jury; and where there is a contrariety of evidence there should not be a new trial, (1 *Wils.* 22,) because where there is evidence on both sides the jury are the proper judges. *Ashley* v. *Ashley,* 2 *Str.* 1142; *Hankey* v. *Trotman,* 1 *Bl. Rep.* 1; *Beardmore* v. *Carrington,* 2 *Wils.* 249; *Swain* v. *Hall,* 3 *Wils.* 47.

As for the circumstance that the deed was a surprise, it is altogether unfounded; they gave us notice to produce the witness, and that they would prove it fraudulent.

There is, however, an impropriety in granting a new trial in an action of ejectment after a trial at bar. *Andrews* 315; 2 *Salk.* 650.

*Leake* and *Ogden* replied.

KINSEY, C. J. It is evident, from the manner in which this motion has been argued, that all, or nearly all, the points that have been contended for here were urged at the trial, and submitted to the consideration of the jury who tried the cause.

The question of fraud was left altogether to the jury to

F

Den, ex dem. Chews, v. Sparks.

determine from the evidence; they were not even directed that, if they believed particular facts to be as stated, they were to declare it void, nor that the whole of them, collectively, would necessarily lead to this inference; they were left free to determine it fraudulent or honest from the evidence, as it was laid before them. This, in my opinion, was the proper course.

I am unable to bring my mind to assent to the proposition that a conveyance intended to prevent a forfeiture to Great Britain, on account of acts arising from a resistance to the usurpations and unjust claims made by that government, can [70] ever, in our courts, be pronounced fraudulent for that reason. We had the same right to defeat the forfeitures which, had they succeeded, they would have had to exact them—the same right as to resist by force their other unjust claims. In my opinion, the secreting a purse from a highwayman may, with equal reason, be denominated fraudulent.

It is said that this deed would have been fraudulent as against the king had he succeeded. This expression is improper in the mouth of an American. Unquestionably that government would have called it so, as they would also have called our resistance rebellion; but neither of these terms can with propriety be applied in this manner by us. They would have put us to death for the one act, and seized upon our property for the other; both must be right, or neither, and to me it appears rather a novel idea in this country to say that the first was illegal, or the second fraudulent. In a court deriving all its authority, and its existence, from the principles of the Revolution, these positions cannot be rendered plainer by language—they are self-evident.

I have no inclination at present to enter further into the questions involved in this case. Other ejectments are depending on the same title, which we have no desire to prejudge. I am against a new trial.

SMITH, J., dissented.

CHETWOOD, J., concurred with the Chief Justice.

Motion refused

CITED *in Den v. DeHart,* 1 *Hal.* 450; *Den* v. *Tomlin,* 4 *Harr.* 82.